762 F.2d 1006
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MICHAEL SHAW BURRIS, A MINOR, B/N/F AND NATURAL GUARDIAN,
SARAH ANN BURRIS AND SARAH ANN BURRIS,
INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
NATIONWIDE TRUCK BROKERS, INC., DEFENDANT-APPELLEE.
 NO. 84-5241
 United States Court of Appeals, Sixth Circuit.
 4/23/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY
 BEFORE: KEITH and JONES, Circuit Judges; and DIGGS TAYLOR, District Judge.*
 Per Curiam.
 
 
 1
 Michael Burris and his mother Sarah Burris appeal a directed verdict for Nationwide Truck Brokers, Inc. (N.T.B.) in this action for personal injury. This case presents the question whether reasonable minds could reach only one conclusion as to the existence of an employment relationship between a co-driver and a motor carrier lessee. Upon consideration we reverse and remand.
 
 I.
 
 2
 N.T.B. sold a tractor to William Burris and then leased the tractor from him. The written sale-lease agreement provided that the tractor and its driver were within N.T.B.'s exclusive control. Under the agreement, N.T.B.'s responsibility for public injury and property damage arose only when the truck was 'actually operated' in its 'service' or at its 'direction.'
 
 
 3
 While the agreement was in effect, William Burris and his co-driver Danny McDaniel drove the tractor, which displayed N.T.B.'s placards, from Madisonville, Tennessee to Georgia. In Georgia, they picked up a loaded trailer that N.T.B. had instructed them to deliver in Michigan. After driving the tractor-trailer to Lake City, Tennessee, the tractor malfunctioned. Pursuant to the sale-lease agreement, William Burris reported the malfunction to N.T.B.. N.T.B. then told him to get the tractor repaired after delivering the trailer and its bill of lading to another N.T.B. driver.
 
 
 4
 William Burris and McDaniel, upon returning to Madisonville, found the other driver, gave him the bill of lading, and then, drove the tractor to a garage. Upon learning that the garage could not repair the tractor, they removed the tractor and parked it in the driveway of William Burris's home. The next day, in order to take the tractor for repairs in Knoxville, Tennessee, McDaniel backed it out of the driveway and in doing so, the tractor ran over William Burris's two year old son, Michael Burris.
 
 
 5
 Michael Burris and his mother filed a personal injury suit against N.T.B.. N.T.B. twice moved for summary judgment and contended that there was no agency relationship between McDaniel and itself. After the district court denied both motions, N.T.B. moved for a directed verdict. The district court denied N.T.B.'s motion, but later directed a verdict for N.T.B. Michael Burris and his mother now appeal that verdict.
 
 II.
 
 6
 In considering the propriety of the grant of a directed verdict this Court must determine whether there is substantial evidence from which the jury could find in favor of the party against whom the motion was made. Coffy v. Multi-County Narcotics Bureau, 600 F.2d 570, 579 (6th Cir. 1979). In doing so we must view the evidence in a light most favorable to the appellants, without weighing the credibility of witnesses or considering the weight of the evidence. Id. If the evidence clearly shows that reasonable minds could only find in favor of N.T.B., then we must conclude that the district court correctly directed a verdict for N.T.B.. Id. If the evidence clearly shows that reasonable minds could have come to more than one conclusion, then we must find that the district court incorrectly directed a verdict in favor of N.T.B..
 
 A. Federal Law
 
 7
 In directing a verdict in N.T.B.'s favor, the district court reasoned that the tractor was not used on a 'mission' for N.T.B. since it was undergoing repair. In support, the district court cited Wilcox v. Transamerican Freight Lines, Inc., 371 F.2d 403 (6th Cir.) (per curiam), cert. denied, 387 U.S. 931 (1967).
 
 
 8
 In Wilcox the lessor-driver of a tractor-trailer detached the trailer upon delivery to a terminal in Dayton. After going 'off duty' he decided to drive the tractor to a terminal in Cincinnati where he had parked his own car. Shortly after leaving the Dayton terminal, the lessor-driver had an accident. In considering the appeal, this Court rejected the contention that ICC regulations impose absolute liability upon motor carrier lessees. Instead this Court held that 'I.C.C. Regulations do not impose a liability on a carrier using leased equipment greater than that when operating its own equipment.' Id. at 404. Hence, this Court construed liability under ICC regulations to be equal to liability under Ohio's common law principle of respondeat superior. Because the lessor-driver had implied authority to drive home, the carrier was liable.
 
 
 9
 Burris recognizes Wilcox's embodiment of our position on the scope of a motor carrier lessee's liability under ICC regulations. He explicitly contends, however, that Wilcox is not sound because it cites no authority and has been criticized by other courts. See Price v. Westmoreland, 727 F.2d 494, 497 (5th Cir. 1984); Rodriguez v. Ager, 705 F.2d 1229, 1236 (10th Cir. 1983). Burris implicitly contends that Wilcox is unsound because it fails to recognize that ICC regulations were designed to prevent motor carriers from evading liability for public harm caused by leased vehicles. See Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc., 423 U.S. 28, 37, (1975) (identifying purposes of ICC regulations); Indiana Refrigerator Lines v. Dalton, 516 F.2d 795, 796 (6th Cir.) (per curiam) (identifying three purposes of ICC regulations), cert. denied, 423 U.S. 985 (1975). Burris, therefore, urges reconsideration of Wilcox.
 
 
 10
 We do not believe that Wilcox should be reconsidered. It recognizes that ICC regulations were, in part, designed to prevent motor carriers from evading liability for public harm through leasing arrangements with non-regulated carriers. Wilcox simply chooses to prevent that evasion by construing motor carrier liability under the applicable state law agency principles rather than by applying a theory of absolute liability.
 
 B. State Law
 
 11
 The district court's judgment does not appear to recognize that an analysis of state law is required. Thus, absent a reconsideration of Wilcox we must determine N.T.B.'s liability, if any, under the applicable state law principles of agency.
 
 1. Existence of Employment Relationship
 
 12
 As a general proposition of law, the doctrine of respondeat superior applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged with the injury resulting from the wrong. Such a relationship existed if N.T.B. had the right or power to control McDaniel's actions. See Haupt v. Cincinnati, N.O. & T. P. Ry. Co., 232 S.W.2d 598, 602 (Tenn. App. 1950). We do not believe that reasonable minds could have come to only one conclusion in favor of N.T.B.. Instead, we believe that reasonable minds could have reached different conclusions as to whether an employment relationship existed between McDaniel and N.T.B. as a matter of fact.
 
 
 13
 It appears that N.T.B. has the right or power to control McDaniel's action because N.T.B. had exclusive control over the tractor. Control over the tractor gave N.T.B. control over either the lessor-driver or the co-driver, McDaniel. Moreover, N.T.B. exercised its control over the tractor by ordering William Burris to get the tractor repaired. Therefore, the jury should have been given the opportunity to decide whether McDaniel was an N.T.B. employee as a matter of fact. We note that Wilcox does not preclude that result.
 
 
 14
 2. Scope of Authority & Mutual Benefit Rule
 
 
 15
 Section 55-10-311 of the Tennessee Code creates a presumption that a driver of an auto is operating the vehicle with the authority and consent of the owner and states, in pertinent part,
 
 
 16
 In all actions for injury to persons and/or to property caused by the negligent operation or use of any . . . motor propelled vehicle within this state, proof of ownership of such vehicle, shall be prima facie evidence that said vehicle at the time of the cause of action sued on was being operated and used with authority, consent and knowledge of the owner in the very transaction out of which said injury or cause of action arose, and such proof of ownership likewise shall be prima facie evidence that said vehicle was then and there being operated by the owner, or by the owner's servant, for the owner's use and benefit and within the course and scope of his employment.
 
 
 17
 10 Tenn. Code Ann. Sec. 55-10-311 (1980). 49 U.S.C. Sec. 11107 recognizes motor carrier lessees as owners of the leased vehicles and states, inter alia, that motor carriers who lease vehicles
 
 
 18
 (4) have control of and [are] responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary of Transportation on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier.
 
 
 19
 49 U.S.C. Sec. 11107 (1984) (emphasis added). Two reasons suggest that Sec. 11107 should be construed in pari materia with Sec. 55-10-311. First, the purpose of Sec. 11107 is to put use and operation of leased vehicles in parity with equipment owned by motor carriers. Accord Dalton, 516 F.2d at 796. Second, Sec. 11107 anticipates such a construction because it uses the language 'compliance . . . with other applicable law.' We, therefore, construe both sections together.
 
 
 20
 Construed in pari materia, Sec. 55-10-311 and Sec. 11107 establish under Tennessee law a prima facie case of N.T.B.'s ownership because it appears that N.T.B. authorized, consented to, and knew that at the time of the accident the tractor was being driven. That prima facie case is strengthened by the fact that N.T.B. directed William Burris to have the truck repaired. Consequently, reasonable minds could have concluded that McDaniel was within the scope of his employment at the time of the accident.
 
 
 21
 N.T.B. contends that according to the sale-lease agreement, repairs and maintenance are not a part of N.T.B.'s costs. N.T.B. argues that because it was not responsible for repairing the tractor McDaniel and William Burris were acting for thier own benefit and, thus, reasonable minds could only conclude that McDaniel was not acting within the scope of his employment. That argument fails because under Tennessee law so long as the trip benefits the employer, it does not matter that it also serves the employee's purposes. See Herron v. Fletcher, 503 S.W.2d 84, 87 (Tenn. 1973). Nevertheless, the jury should have been given the opportunity to determine whether the trip benefitted N.T.B., therefore, bringing it within the scope of McDaniel's employment.
 
 
 22
 Accordingly, we REVERSE the district court's judgment and REMAND the case to determine whether an employment relationship existed as a matter of fact and whether McDaniel was within the scope of his employment at the time of the accident.
 
 
 
 *
 Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation